# EXHIBIT B

# *Cynthia Fuller*

# *vs.*

# *State of Idaho, Department of Corrections et al.*

# *Expert Report of Louise F. Fitzgerald, Ph.D.*

# Part I

# Introduction and Overview

*Louise F. Fitzgerald, Ph.D. Fitzgerald,*
*Collinsworth & Associates*
*2402 Pond Street*
*Urbana, IL 6180*

March 31, 2014

I, Louise F. Fitzgerald, Ph.D., am Professor Emeritus of Psychology and Gender and Women's Studies at the University of Illinois at Urbana-Champaign, where I hold appointments in the Divisions of Clinical/Community Psychology as well as Industrial/Organizational Psychology, and for a number of years directed the Psychology and Law Clinic at the Psychological Services Center. I am currently also Adjunct Professor of Psychology at NOVA Southeastern University, where I teach in the graduate program in forensic psychology.

For the past 25 years, I have specialized in the study of sexual harassment: its risk factors and organizational causes, its psychological and other consequences, the ways in which victims respond to sexually harassing situations, and how work organizations and educational institutions can prevent, discourage, and remedy this problem. I have published widely on these topics in peer-reviewed scientific journals in my field. In addition, I have received numerous grants and contracts from government agencies (e.g., U.S. Department of Education, the National Institutes of Health, U.S. Department of Defense) to support these and other studies. I have consulted with numerous work organizations and educational institutions concerning their policies and procedures, both in general and in the aftermath of sexual harassment investigations. In recognition of my contributions in this area, the American Psychological Association named me the 2003 recipient of its Senior Career Award for Distinguished Contributions to Research in Public Policy. In 2013, I was named recipient of a Life Time Career Award by the Conference on Occupational Safety and Health.

I have been qualified as an expert witness in both state and federal court, and provided consultation to the U.S. Equal Employment Opportunity Commission, the U.S. Department of Justice, the U.S. Department of Defense, the U.S. Merit Systems Protection Board, various Legal Aid societies, and numerous private attorneys. I have conducted psychological evaluations of over 200 plaintiffs involved in sexual harassment litigation at the request of both plaintiff and defense attorneys, as well as training workshops on forensic evaluation in such cases and CLE sessions for national and state bar and psychological associations. In addition, I have taught the scientific basis of our knowledge of sexual harassment at both the graduate and undergraduate levels and trained graduate students to become skilled in forensic evaluations. I have testified numerous times in both federal and state court, as well as in administrative hearings and arbitrations. Finally, I have assisted in the preparation of *amicus* briefs for the American Psychological Association (In the matter of *Harris v. Forklift Systems, Inc.)* and the National Employment Lawyers Association (In the matter of *Ellerth v. Burlington Industries).*

3

This report details my opinions in the matter of Cynthia Fuller vs. State of Idaho, Department of Corrections, et al., currently pending in the U.S. District Court for the District of Idaho, Civil No. 1:13-cv-00035-JLQ. This report was requested by Erika Birch, Esq. and Kathryn Harstad, Esq., attorneys for the plaintiff, to address a number of specific questions, based on the methods of clinical science, the body of scientific literature on sexually harassing behavior in work organizations, and the facts of the present case.

Clinical science provides empirically validated methods for independently evaluating the psychological condition of individuals involved in litigation. Such methods typically include the taking of a psychosocial history; the conduct of structured diagnostic interviews; and the administration and interpretation of standardized psychological testing. In the present instance, I was asked to undertake independent psychological evaluation of the plaintiff; the purpose of this undertaking being to provide expert scientific and professional analysis to assist the court in deciding disputed issues (Wiener, 1995).

The report begins with an overview of the empirical scientific literature on sexually harassing behavior, with specific focus on educational institutions; its nature, causes, consequences, how victims typically respond, and how educational institutions can prevent and respond to this problem. This review provides context and substantive underpinning for the clinical analysis of the plaintiffs. It is followed by a full analysis of the psychological condition of the plaintiff, Ms. Cynthia Fuller, including a description of methods, materials, and conclusions.

I conclude with a summary of my opinions in the case, which are based on all material summarized, referenced, or cited in this report, as well as the overall body of literature on sexual discrimination and harassment, and their impact on those who experience them. I also draw on my experience as a research and clinical scientist, and expert witness over the past 25 years. The attached appendices contain a list of all documents reviewed, as well as all scientific references cited, a copy of my curriculum vita, fee schedule, and list of federal cases in which I have testified over the past four years.

4

*Part II*

*Scientific and Substantive
Basis of Opinions*

In the last two decades, sexual harassment has received increasing recognition as a serious social problem. Although the term itself is by now familiar to most people, misunderstanding remains concerning its nature, impact, and the ways that victims respond when confronted with such experiences. In particular, there remains some confusion concerning the distinction between statutory and legal guidelines, on the one hand, versus actual behavior on the other.[1]

Social science research has identified three general categories of offensive sex-related behaviors: gender hostility unwanted sexual attention, and sexual coercion (Gelfand, Fitzgerald, & Drasgow, 1995; Fitzgerald, Gelfand, & Drasgow, 1996; Fitzgerald, Swan, & Magley, 1997) that, under certain circumstances, can qualify as illegal sex discrimination.[2] Gender hostility is not sexual in the usual sense of erotic invitations but, rather, consists of crude, offensive, and derogatory sex-based behavior (e.g., obscene jokes, sex-related insults) that serves to convey offensive or insulting attitudes about women[3]. Such behavior is not complimentary, seductive, romantic, or amusing; rather, it emphasizes women's sexual function, as well as their sexual attractiveness or lack thereof, sending a hostile message to female employees that they are women, not workers, and do not belong in this particular workplace. Such hostility is directed at women simply because they are women and is by far the most widespread form of harassment found in work organizations; nearly half of all women who experience offensive sex-related behavior in the workplace describe experiences of gender hostility and harassment.

Unwanted sexual attention is just that, and consists of uninvited, unwanted, and non-reciprocal sexual attention and behavior that, although unwelcome to the recipient, is not tied to job conditions or reward. Sexual coercion refers to attempts to extort sexual cooperation by the implicit or explicit promise of job-related rewards or threats of punishment. As noted previously, this is a scientific, rather than a legal classification; however, sexual coercion parallels, from a behavioral perspective, the seminal legal concept of quid pro quo, whereas gender hostility and unwanted sexual attention represent the behavioral components of a hostile environment. Additional factors not relevant to this discussion are required for such acts to qualify as a legal cause of action (e.g., timely notice, procedural issues, and the like); whether or not these factors are present, such behavior leads to workgroup disruption, declines in productivity, work withdrawal, and damage to physical and psychological well-being.

---

[1] An individual may encounter any number of offensive sex-related experiences that, for various reasons (e.g., frequency, severity, duration), would not qualify as illegal sex discrimination. When social scientists speak of sexual harassment, they are referring to behavior, not a legal finding of fact; legal determinations turn on a number of considerations (e.g., proof of unwelcomeness, statutes of limitations, organizational response) that research can inform but not assess.

[2] In addition to sexual harassment, sex discrimination includes other prohibited acts (e.g., disparate treatment).

[3] Targets of sexual harassment are traditionally referred to in the female gender; this is not to deny that men can be and sometimes are harassed; see, for example, Berdahl, Magley, & Waldo, 1996; Waldo, Berdahl, Fitzgerald, 1998; and Magley, et al. (1999).

## Causes of sexual harassment

Many people believe that sexual harassment is an aberration, perpetrated by deviant individuals who suffer from some type of psychological problem.   This is generally not the case.  Although a number of researchers have attempted to identify a pattern of easily recognizable demographic or interpersonal characteristics that characterize the typical harasser, such attempts have been largely unsuccessful. Although it is certainly true that some individuals are more likely to harass than others, this propensity is grounded in attitudes towards sexuality and beliefs about proper roles for men and women, characteristics not necessarily easily apparent (Pryor, 1987; Pryor, LaVite, & Stoller, 1993).

It is by now well accepted in the scientific community that it is organizational conditions rather than individual characteristics that are the most powerful predictors of sexual harassment (Hulin, et al., 1996; Pryor, et al., 1993).   Organizations that are characterized by a skewed gender ratio (i.e., most employees are male, and women are relatively few), job duties and tasks that are historically masculine in nature, and organizational tolerance of offensive behavior typically have far greater problems with sexual harassment.   Organizational tolerance (sometimes known as organizational climate) is the single most powerful factor in determining whether sexual harassment will occur and will be damaging when it does. Studies have shown that strict management norms and a climate that does not tolerate offensive behavior can inhibit harassment even by those with a propensity to do so (Pryor, et al., 1993).  The concept of organizational tolerance as it relates to this case is discussed in greater detail below.

## Emotional and psychological consequences of sexual harassment

Numerous studies document that offensive sex-related behavior has serious consequences, from embarrassment, anxiety, and lowered self-esteem to full-fledged psychological disorders such as Major Depressive Disorder and Post-Traumatic Stress Disorder (Dansky & Kilpatrick, 1997; Fitzgerald, Buchanan, Collinsworth, Magley, & Ramos, 1999; Koss, Goodman, Browne, Fitzgerald, Keita, & Russo, 1994; Schneider, Swan, & Fitzgerald, 1997). In one of the first large scale studies of its kind, the United States Merit Systems Protection Board (1981) reported that literally thousands of female employees experienced deterioration in their emotional or physical condition as a result of experiencing unwanted sex-related behavior at work.    The USMSPB has twice replicated these findings (USMSPB, 1988; 1995).

In an early study, Crull (1982, 1984) described physical symptoms (e.g., headaches, sleep disturbance, disordered eating, gastrointestinal disorders, nausea, weight loss (or gain) and crying spells) in a sample of self-identified victims who sought assistance from Working Women United.    In 1988, the Institute for Research on Women's Health (1988) declared that sexual harassment constitutes a serious threat to women's psychological and physical wellbeing, and the National Council for Research on Women (1991) noted that the American Psychiatric Association recognizes harassment as a severe stressor (see also Hamilton, et al., 1987).

7

Gutek and Koss (1993) reviewed the data on the outcomes of sexual harassment and reported findings of extensive stress-related physical symptoms, including gastrointestinal disturbances, jaw tightness and teeth-grinding, nervousness, binge-eating, headaches, inability to sleep, tiredness, nausea, loss of appetite, weight loss, and crying spells.   Emotional reactions included anger, fear, depression, anxiety, irritability, lowered self-esteem, feelings of humiliation and alienation, and a sense of helplessness and vulnerability.   To this list can be added disruption of sexual adjustment (e.g., loss of desire, flashbacks during intercourse) and difficulties with partners, families and significant others.

Although these early studies were based largely on reports of self-identified victims, and thus can be criticized on these grounds, a number of rigorous investigations have since confirmed that sexually harassing experiences can cause substantial emotional damage,[4] even when such experiences are less serious and intense than that typically required to trigger statutory relief.  In the first of these studies to appear, Schneider, Swan, and Fitzgerald (1997) studied women employed in two different organizations; they examined the consequences of harassment on a variety of reliable and valid measures of psychological status, carefully controlled for the effects of other stressors or confounding influences.    Their results demonstrated that the experience of sexual harassment exerted significant and substantial impact; women who had been harassed had significantly lower levels of general psychological adjustment as well as significantly elevated symptoms of Post-Traumatic Stress Disorder (PTSD).  The impact of harassment remained significant even after controlling for other potential explanations; as the authors observed, "This study presents evidence that sexual harassment, even at relatively low frequencies, exerts significant negative impact on women's psychological well-being..." (p. 412).

Fitzgerald, Drasgow, Hulin, Gelfand, and Magley (1997) subsequently reported an even more stringent test of the relationship between sexually harassing behavior and emotional distress.  Employing sophisticated statistical procedures, they documented a strong link between harassment and negative outcomes in a large sample of employed women.  As they noted, "(O)ur results support the contention that sexual harassment is costly in both organizational and human terms.  Women who were harassed not only experienced more psychological problems but also reported [more negative job outcomes]" (p. 586).  Harassment significantly affected every aspect of these women's lives, from job satisfaction to physical health, providing strong evidence for the assertion that harassment causes significant emotional distress, even at levels far less serious than those that typically find their way to court.

These results have subsequently been replicated in large studies of the five

---

[4] Other types of damage have also been demonstrated; for example, Morrow, McElroy, and Phillips (1994) found evidence that women who were harassed reported less satisfaction with work, supervision, coworkers, and promotions, as well as lower levels of organizational commitment, greater role ambiguity, role conflict, and job stress. Other researchers report similar results; see, for example, Schneider, et al., 1997.

military services, utilizing scientifically selected stratified random samples combining over 28,000 individuals (Fitzgerald, Drasgow, & Magley, 1999; Magley, et al., 1999). These researchers confirmed that harassment exerts significant negative influence on psychological status (e.g., anxiety and depression) and physical health, even after controlling for other factors; such effects "kick in" at relatively low levels of exposure.

Some of the most compelling research in this area can be found in studies linking sexual harassment not only to psychological distress (i.e., symptoms) but also to actual diagnosable psychological disorder (e.g., major depressive disorder, post-traumatic stress disorder).   Based on data from the National Women's Study, Dansky and Kilpatrick (1997) reported that women who had experienced sexual harassment were significantly more likely to suffer from Post-Traumatic Stress Disorder and Major Depressive Disorder than other women.   Based on a large, nationally representative random sample and state-of-the-art diagnostic techniques, this study is considered the "gold standard" in terms of scientific knowledge concerning the effects of sexual harassment on women who experience it.

Finally, Fitzgerald and her colleagues (Fitzgerald, Buchanan et al., 1999) conducted the only reliable study to date based on plaintiffs in sexual harassment litigation.   Consistent with the Dansky and Kilpatrick research described above, they found that the most common diagnoses found in this population were Major Depressive Disorder and Post-Traumatic Stress Disorder.

*Summary.*   In sum, a large body of scientific data reliably demonstrates that experiencing sexual harassment, even at low levels of frequency and intensity, can lead to decrements in psychological well-being and elevations in psychological distress, up to and including major emotional disorders.   Although not every individual who is exposed to such experiences will develop symptoms of distress, such reactions are more common than not; indeed, they appear to be the normative response.

### Factors and conditions that lead to psychological harm

There are a number of complementary models of vulnerability and harm, of which Fitzgerald, Swan, and Magley's (1997) is the most detailed.   Drawing on modern cognitive frameworks for understanding stressful life events, these authors outline three sets of factors that influence severity:   stimulus factors (i.e., the behavior itself), contextual factors (i.e., the context in which it takes place), and individual factors, that is the vulnerability of the individual target.

*Stimulus factors.*   Stimulus factors refer to objectively defined aspects of the harassing behavior itself; for example, was it public or private, isolated or repetitive, verbal, physical, or both.  Such elements can be classified into three general categories: frequency, intensity, and duration.  Frequency refers simply to the number of incidents, whereas duration refers to the length of time during which the woman was subjected to the stressful situation.  Intensity refers to what is generally thought of as the magnitude of the stressor.  Seven aspects of intensity have so far been identified:

9

(1) a powerful perpetrator
(2) multiple perpetrators
(3) behavior that is physical as opposed to verbal
(4) behavior that is frightening, as opposed to annoying
(5) behavior that is directly focused on the target
(6) restricted possibilities for escape
(7) multiple types of harassing behavior

A number of these have so far received empirical support.  For example, the negative impact of frequency on target well-being has been supported in a number of studies (Schneider, et al., 1997; Drasgow, et al., 1999; Brooks & Perot, 1991) and Pryor and Whalen (1997) found that targets who experience multiple types of harassment have worse outcomes than those who do not.  Harassment by someone in a position of authority and control is virtually always experienced as more severe, and Langhout, et al. (2005) have recently demonstrated an empirical link between perpetrator power and negative outcomes.

*Contextual factors*. The critical finding in this area is that harassment is more common and targets have worse outcomes in settings tolerant of such behavior – tolerance being defined as the perception that the issue is not taken seriously, that there is high risk for complaining, and little chance that perpetrators will be sanctioned.  In other words, organizational tolerance of harassment can be defined as the general perception among employees that there is little that can or will be done to prevent or remediate it, combined with elevated levels of risk to victims for complaining.

Other aspects of tolerance that are of importance include the lack of policies or procedures for dealing with sexual harassment, normative behavior that appears to tolerate harassment, and simply being in an environment where other women are being harassed (such a situation is known to social scientists as ambient harassment, or "bystander stress").  Glomb and her colleagues (Glomb, et al., 1997) demonstrated that ambient harassment and a tolerant climate produced psychological distress equivalent to that of being directly harassed.

*Individual vulnerability factors*   Examining individual factors shifts the lens of attention from harassment itself and the context in which it occurs to the individuals who are its target.  It is well accepted that certain personal characteristics can exacerbate or buffer the effects of a stressor, leading to more or less severe outcomes than would otherwise be the case.  This concept is known as victim vulnerability. Fitzgerald, Swan et al. (1997) suggest five aspects of vulnerability that may affect outcomes:

1) victimization history
2) personal resources
3) attributions
4) attitudes
5) control

**Victim Responses to Sexual Harassment**

Considerable research has examined the ways in which individuals respond to sexually offensive situations in the workplace (Fitzgerald, et al., 1995; Gruber, 1989). This work initially arose in response to the finding that, despite the widespread nature of workplace harassment, the great majority of victims never reported their experiences to their employers; indeed, many never told anyone.  Such reticence was often taken as implying that the situation never happened, the complainant herself was complicit in the situation, or "it couldn't have been that bad". As research continued, it became apparent that this formulation was a serious over-simplification; that responding to harassment was a process, not a single act; and that there were numerous ways in which targets attempt to manage the situation, of which formal reporting was typically the last resort.

A number of schemes for classifying these responses were proposed (e.g., Gruber, 1989, Maypole, 1986; Terpstra & Baker, 1989), systems that focused mainly on the degree to which the victim responded assertively to the harasser.  Although useful as a starting point for theory, such frameworks suffered from a major shortcoming:  that is, they were not derived from the reactions of actual victims; rather, they were based on rational derivation or, problematically, on the written responses of research participants to brief descriptions of hypothetical situations.  Given that actual victims have been shown to behave quite differently than research participants or the general public say they would behave, such systems were not helpful in understanding the behavior of women who had actually been harassed.

Addressing these issues, Fitzgerald (1990; Fitzgerald, Swan & Fisher, 1995) proposed a framework derived by coding responses provided by actual victims surveyed in a major sexual harassment prevalence study (Fitzgerald, et al., 1988).  The system consists of 10 strategies, classified as either *internally focused* (endurance, denial detachment, reattribution, and illusory control) or *externally focused* (avoidance appeasement, assertion, seeking organizational relief, and seeking social support). Internal strategies are characterized by attempts to minimize stress by managing the cognitions and emotions associated with the event (e.g., "I just tried to forget about it"; "I told myself he didn't mean to upset me") whereas externally focused strategies are problem-solving in nature (e.g., "I told him to leave me alone"; I reported him to HR").

This system has the advantage of including the cognitive strategies that actual victims frequently employ, and parallels the more general approach (emotion-focused and problem-focused coping) identified by Lazarus and Folkman (1984; Folkman and Lazarus, 1988) in their comprehensive theory of stress and coping.  Thus, unlike uni-dimensional continuum-of-assertiveness frameworks, this model reflects the multidimensional nature of these complex behavioral phenomena, which are reviewed in more detail below.

*Internally focused responses*.   One of the most frequent responses to harassment is simply to ignore it and do nothing (<u>endurance/extinction</u>); such a

response may reflect the woman's belief that the behavior is irrelevant or non-threatening, that she has no effective alternatives, or that it is in her best interest to do nothing. A number of victims report that "doing nothing" is actually an effective practical strategy, in that resistance is often met with amusement and increased attention from the harasser; however, most research shows that the advice "just ignore him and he'll go away" is ill-founded, in that the behavior typically continues for some period of time. A closely related reaction is to pretend that the situation is not happening, that it doesn't matter, or has no effect (denial). Such responses are extremely common (Fitzgerald, et al., 1988; Gruber & Bjorn, 1982; Gutek, 1985; Gutek & Koss, 1993; Loy & Stewart, 1984; USMSPB, 1981; 1988; 1995).

Little is formally known concerning the prevalence of the other internally focused strategies that have been identified (detachment, illusory control, reattribution). Gruber and Bjorn (1982) found that 10% of the victims they studied used reattribution as a coping strategy, that is, reinterpreting the situation in such a way that it was defined as less threatening, that there were extenuating circumstances explaining the man's behavior (e.g., he was lonely, or drunk, etc.), or attempted to interpret his intentions as benign (Gutek, 1985; Rabinowitz, 1990). Self-blame, labeled here as illusory control, is rarely formally studied, although Rabinowitz (1990) notes that it appears to be common, an assertion born out by clinical observation as well as some research. Jensen and Gutek (1982) found that 25% of female victims attributed the problem in some way to their own behavior, an attribution that inhibited both reporting and seeking social support.

*Externally focused responses.* The most common problem-solving strategy appears to be avoidance; the literature suggests that the majority of victims actively attempt to avoid the person who is bothering them, to the degree possible (Culbertson, et al., 1992; Fitzgerald, et al., 1988; Gutek, 1985; McKinney, Olson & Satterfield, 1988; Schneider, 1991; USMSPB, 1981; 1988; 1995). Also common (particularly in overtly sexual situations) is appeasement, an attempt to "put off" the harasser without direct confrontation (e.g., humor, excuses, delaying, etc.), a response that Gruber and Bjorn (1982) labeled as *masking*. They reported that 10% of the victims they studied used delaying tactics hoping the harasser would "take the hint" that they were not interested.

Not surprisingly, a substantial number of individuals seek social support; 68% of the USMSPB (1981) targets discussed the experience with a co-worker and 60% talked about it with friends and family. What little research exists on the reactions of others, however, suggests they are less than uniformly supportive (e.g., Loy & Stewart, 1984). Targets also employ a variety of assertive responses to communicate that harassment is unwelcome, most commonly, a direct request that the offender stop his behavior and leave the woman alone; 44% of the female Merit Systems (1988) targets asked the harasser to stop.

By far the least frequent response is to seek some form of institutional relief (i.e., bring a formal complaint, file a lawsuit). Victims apparently turn to such strategies as a last resort when all other efforts have failed. Not surprisingly, the least confrontational

responses are the most common; victims in the workplace are more likely to talk with a supervisor than file a formal complaint, and legal claims are by far the least common response.

## Outcomes of Response Strategies

Given that victims respond in multiple ways, it is reasonable to ask what sorts of things influence these responses. In particular, the question commonly raised is "Why didn't she just report him?" Faced with this question, women give a variety of answers. Many prefer to handle the situation themselves or believe it was not "important enough" to report. They fear being labeled as "whiners", believe that nothing can or will be done (Gutek & Koss, 1993; Martindale, 1990; USMSPB, 1981), or are reluctant to cause problems for the offender (Gutek, 1985; Jensen & Gutek, 1982; Martindale, 1990). A very common reason, however, is fear – fear of retaliation, of not being believed, or damaging one's situation, or being shamed and humiliated (Fitzgerald, et al., 1988; Fitzgerald, Swan, & Fisher, 1995; Gruber & Bjorn, 1982; Gutek, 1985; Gutek & Koss, 1993; Martindale, 1990; Phillips, Stockdale, & Joeman., 1989; Saunders, 1992; USMSPB, 1988). Unfortunately, such beliefs are often well founded.

Contrary to conventional wisdom, a number of studies have documented that assertive responses such as confronting the harasser or filing a complaint are not only frequently ineffective, but often actually make things worse. For example, Hesson-McInnis and Fitzgerald (1997) found that assertive responding was associated with more negative outcomes of every type (including psychological and health-related) even after severity of harassment was controlled. In this same vein, Bergman and her colleagues (Bergman et al. 2002) found that at best, official complaints had no impact, and often made things worse. Finally, Stockdale (1998) reported that individuals who experienced frequent harassment and used confrontive coping strategies tended to experience worse outcomes than did others. Furthermore, use of confrontive responses tended to amplify associations between harassment pervasiveness and consequences; in other words, the effects of frequent harassment were more damaging when the woman confronted the problem directly.

In sum, despite pervasive public belief that victims should "handle" harassment assertively, confront the perpetrator immediately, and report him to the appropriate authorities, reactions to such responses are generally not favorable for those who actually "blow the whistle." As Livingston (1982) remarked, "Given the immense psychological and economic costs to individuals who use formal action, in contrast to the potentially meager gains, it is not surprising that so few victims choose this response" (p. 15). The way in which any individual will cope with a sexually harassing situation depends one (1) her cognitive evaluation of the situation with respect for her well-being (i.e., is it irrelevant, benign, or threatening and to what degree) and (2) the options that are realistically available, their costs and benefits, and what is at stake. Such evaluations are part of a complex, reflexive process that changes over time as the situation unfolds and are influenced by both resources and constraints, personal and environmental.

13

**Issues of particular salience for paramilitary organizations**

In examining the dynamics of the present case, the importance of the plaintiff's position as a woman in a highly masculinized male dominated organization should not be under-estimated.   In particular the specific influence of the paramilitary culture is critical to understanding the situation, its dynamics, and the perceptions and actions of the various parties involved.   To begin, it is important to note that the effects of gender segregation in the workplace have been studied for many years, are well recognized, and well known by social scientists.   Briefly, highly gender segregated occupations are characterized by strong sex-role stereotyping, in which the occupation itself becomes identified in the minds of its members and the general public with the stereotypical gender characteristics of the majority members.  In other words, when an occupational group is composed almost exclusively of men, stereotypically masculine behavior is seen not only as appropriate but even as intrinsically necessary to the successful performance of the job.  Nowhere is this more true than in the military and paramilitary organizations such as law enforcement.   It is fair to say that despite the general loosening of occupational stereotyping in the last three decades, military  and paramilitary organizations remain almost as strictly gender stereotyped as ever.   Such gender stereotyping leads to what social scientists call "sex role spillover" (Gutek, 1985; and others).  Sex-role spillover refers to the fact that the gender role of the dominant group "spills over" into the very definition of the occupation.  Occupational members are reacted to, not in terms of their actual characteristics and abilities, but in terms of whether they fit or deviated from the occupational stereotype.   The gender context of a job is one of the most powerful predictors of whether sexual harassment will occur.

Sex role spillover has other consequences as well; for example, those in the "out group" (i.e., the gender minority) are under great pressure to conform to the gendered occupational culture created by the dominant group.    Considerable research has demonstrated that women in male dominated occupations are seen as less competent and capable than their male colleagues, particularly if they demonstrate behavior or characteristics typically associated with being "feminine" (e.g., expressiveness, nurturance, and the like; Betz & Fitzgerald, 1987).  In other words, to be successful and accepted in a male-dominated occupation, women must exhibit "manly" behavior and characteristics, and carefully avoid deviating from the masculine culture, while at the same time retaining sufficient "femininity" to avoid being seen as too aggressive (e.g., a "ball buster") or deviant (e.g., a "dyke") (Berg & Budnick, 1986). This pressure to conform to occupational cultural norms is exacerbated in military and paramilitary organizations, in which group loyalty is strictly enforced. Thus, being offended by sexualized behavior (which is widely accepted and even ritualized in most masculinized occupations) or complaining of sexual harassment emphasizes that a woman is different, an outsider, in other words, not a man.

Such a situation puts the woman in a strong double bind; if she behaves as a woman (e.g., feminine, emotionally vulnerable) she is seen as violating the role requirements of the job – whatever her actual performance may be. On the other hand,

14

if she adapts herself to the occupational stereotype (e.g., tough, aggressive), she violates the most basic of normative expectations (i.e., gender role expectations) and risks being seen as a bitch, a butch, a harridan, possibly a lesbian.

The consequences for reporting and risking retaliation are more significant in occupations such as police work where individuals depend on the support of fellow officers in life threatening situations. It is one of the reasons that such occupations are characterized by tightly knit groups, as one's life depends on others' back up or rescue. It is not uncommon for this vital support to be withdrawn by fellow officers after women report harassment (Harrington & Lonsway, 2007).

## Summary

1) Offensive sex-related behavior is far from uncommon in the American workplace. Despite a generally high base-rate, a number of factors have been identified that lead to higher levels of risks for organizations and individuals. The most potent of these are (1) a masculinized work place, and (2) an organizational climate that communicates tolerance of offensive sex-related behavior.

2) Sexual harassment causes tremendous damage to individuals and organizations alike. Organizations suffer decreased productivity, increased turnover, and risk to their corporate image with the American public. Individuals suffer more directly and personally; in addition to the obvious job-related consequences (lowered job satisfaction, elevated job stress), targets of sexual harassment experience elevated levels of anxiety, depression, decreased life satisfaction, damaged self esteem, and a full range of psychological symptoms and disorders up to and including posttraumatic stress disorder. Such reactions are not aberrant or only triggered by "severe" episodes; rather, the effects of facing a sexually hostile working climate "kick in" at a relatively low level and lead to a number of stress-related health problems and susceptibility to physical illness.

3) Despite the noxious nature of these experiences, most women do not attempt to access organizational grievance procedures until the situation becomes completely intolerable, and sometimes not even then. The reasons for this have mainly to do with lack of knowledge or understanding of organizational procedures and fear. Unfortunately, research has demonstrated that such fears are very well grounded in that women who do officially report their situations have significantly worse outcomes of every sort than their counterparts who do not. The reason for this iatrogenic effect appear to lie in ineffective, inept, or even hostile organizational responses, as well as hostility on the part of coworkers towards the woman who reports. A major challenge for organizations at this point is to institute fair, clear, and accessible grievance procedures and embed them in an organizational climate that is supportive and not punitive of such response.

4) Paramilitary work organizations such as police work pose particular vulnerabilities for women to experience sexual harassment and retaliation for reporting, and to suffer significant detrimental consequences as a result.

*Part IV:*

*Analysis of IDOC's Sexual Harassment
Prevention and Remediation Programs*

**Organizational Prevention and Remediation Programs**

As the problem of sexual harassment has become increasingly visible, both publicly and legally – and particularly since the courts have articulated the various parameters of organizational liability – there has been growing interest in identifying effective methods and programs for preventing or minimizing harassment.  Guidance for employers has been provided by both federal and state agencies, human resource professionals have developed various programs and standards, and organizational researchers have made extensive attempts to examine and validate these efforts. Although there is clearly no single "silver bullet" for prevention and remediation, it is by now widely accepted that a reasonable program to prevent and correct workplace harassment should include five major components:

1. a clearly worded, widely disseminated policy on sexual harassment prevention;
2. a complaint procedure with flexible options that is designed to encourage employees to come forward;
3. an ongoing education and training program;
4. a prompt and unbiased investigative procedure implemented by an appropriately trained investigator; and
5. prompt and appropriate corrective measures designed to stop the harassment, correct its effects on employees, and ensure that the harassment does not re-occur.

Although the term has only recently been applied in this context, it is by now widely accepted that these five components constitute the essential "standard of care" for sexual harassment prevention in organizations.

**Defendants' Prevention and Remediation Program**

In this part of my report, I review the steps that defendant IDOC has taken to prevent and remediate sexual harassment.

**(1) Sexual Harassment Policy**

Based on case documents and the testimony of IDOC witnesses, it appears that IDOC has not one but three separate policies that can or might apply to sexual harassment, the most relevant of which is Policy 201, Respectful Workplace Policy[12]. The policy itself, which is embedded in approximately 13 pages of related material, consists of section 201.07.03:

*"Sexual harassment is a form of workplace gender harassment.  Sexual harassment is unwelcome sexual advances, requests for sexual favors, or any other verbal or physical conduct or behavior of a sexual nature when:*

---

[12] The other two policies are the Administrative Investigation Policy (which is discussed below) and the Problem Solving Policy, which is not addressed in this report.

30

- *Submission to the conduct is made, either explicitly or implicitly, a term of condition of an individual's employment, or is used as a basis for any employment decision;*

- *The conduct is unwelcome and has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment; or*

- *The conduct is sufficiently severe, pervasive and hostile with continual occurrences to establish a pattern of behavior that significantly alters the condition of employment in an adverse manner, as seen by a reasonable person." (Page 6 of 13).*

At first glance this statement appears simply to track the original 1980 EEOC Policy Guidelines;[13] a closer reading however reveals that the third paragraph is unique, requiring as it does conduct that is "sufficiently severe, pervasive and hostile with continual occurrences" (emphasis added). This paragraph appears to have combined terminology from various legal decisions ("condition of employment", "reasonable person"), while also requiring that there be "continual occurrences" that are not only "severe" but also "pervasive" and "hostile", thus creating an extremely high bar to complaints, higher indeed than that found in regulatory guidance or current case law.

This final paragraph encapsulates each of the major problems with the IDOC policy:

(1) It is overly legalistic. It is true of course that sexual harassment can under certain circumstances violate state and federal law; however, it is also true that most of the destructive and abusive behavior that occurs in organizations does not trigger that standard. It is nonetheless an organizational problem that must be addressed, long before it reaches a legal bar. Sexual harassment can indeed trigger legal liability, but it is first, foremost, and overwhelmingly an organizational problem that damages employees, lowers job satisfaction, increases turn over, and lowers productivity. Policies that are overly focused on legal liability are missing the point of an SH policy, which is not primarily to protect the organization from liability but to inform its employees what behavior it expects of them and what safeguards it provides them.

(2) It is overly complex. Policies should be straightforward, simple, and to the point. A good policy accomplishes its goal in a single page, thus facilitating both employee attention and ease of distribution and posting. The extensive pages of

---

[13] Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:

1. Submission to such conduct was made either explicitly or implicitly a term or condition of an individual's employment,

2. Submission to or rejection of such conduct by an individual was used as the basis for employment decisions affecting such individual, or

3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

boilerplate and administrative detail can and should be reserved for the HR manual and the people who administer the policy.

(3) It is overly stringent.  <u>Policies are not jury instructions; they are statements of organizational goals and requirements</u>.  If the policy lays out extraordinarily stringent requirements (e.g., "severe, pervasive and hostile with continual occurrences"), not only are employees discouraged from complaining, but managers are encouraged to dismiss all but the most egregious behavior as non-problematic.  That appears to be what happened in the present case and the problems with it are clear.  IDOC should streamline and simplify its policy so that it makes clear that it wishes to hear about problematic behavior long before it becomes a violation of Title VII.

According to the EEOC Policy Guidance (1999), a policy should contain a clear definition of prohibited behavior, a statement encouraging employees to come forward before harassment becomes severe or pervasive, a prohibition against retaliation, a clearly described complaint process, reasonable assurances of confidentiality, and a promise of a competent, thorough, and fair investigation.  More is not always better.

## (2) Complaint Procedure

According to the Respectful Workplace policy, defendants' complaint procedure allows complainants to report sexual harassment to "any authority in the department" and does not require them to follow any particular chain of command; <u>this is a very desirable quality.</u>  The policy provides an extensive but non-exhaustive list of examples of "authority" (e.g., any supervisor, manager, lieutenant; HR; warden) and states that complainants may report either verbally or in writing; a written complaint is preferred but not required.  The policy states that the complaint should include the basic facts of the complaint (e.g., name, date, offender, offensive behavior, etc.) and a "description of the remedy the employee desires, if known."

## (3) Education and Training

According to documents produced in discovery, IDOC trains its employees on its "Respectful Workplace Policy".  An introduction is provided in the new employee orientation program and employees are required to complete online refresher courses every year.  Review of the training materials suggests that they are typical of programs of this type directed towards non-managerial employees.

There appears to be no specific training for managers, although they are charged with recognizing when an investigation is required and with conducting an initial inquiry.  This is a critical area for improvement.  As detailed in later sections of this report, IDOC managers clearly do <u>not</u> recognize when an investigation is required (see, e.g., Capt. Shriver, Kraig Galloway, Kim Harvey, Henry Atencio, Kevin Kempf, and others), do not conduct an initial inquiry, and do not report incidents to HR as required.  IDOC should initiate specific sexual harassment training for supervisors and managers focusing on

32

their responsibilities under the policy and helping them understand how to meet their responsibilities.

## (4) Investigative Procedure

Policy 201 states that all complaints will be taken seriously and promptly investigated. It further states that managers are authorized to conduct preliminary inquiries before a formal investigation is authorized in order to determine probable cause. The procedure(s) for such informal inquiry are not described here, but rather under Policy 227, Administrative Investigations.

Policy 227 sets out the roles, responsibilities, and procedures for investigating administrative (i.e., non-criminal) complaints within the IDOC. The policy is extremely detailed and will not be analyzed in depth here. However, the relevant portions direct managers who receive sexual harassment complaints[14] to report those complaints to Human Resources immediately. Additionally, the recipient manager is supposed to initially review and possibly conduct an inquiry into the harassment complaint to determine whether there is sufficient cause for an investigation. If no investigation is warranted, the manager is nonetheless directed to notify Human Resources of the complaint. If the manager determines that an investigation is warranted, he or she requests that an investigation be initiated by the Office of Professional Services (OPS), essentially the equivalent of the more familiar Internal Affairs function ubiquitous in law enforcement.[15] Guidelines for the investigation are outlined and include development of an investigatory plan. At the conclusion of the investigation, OPS submits a report (without opinions or recommendations); based on the report, and possibly other factors, "Senior Management" (and/or the Personnel Committee) makes a determination as to whether the complaint is founded and determines what discipline (if any) is appropriate.[16]

## (5) Corrective Action

The Respectful Workplace Policy (201) says little about sanctions other than that substantiated complaints will lead to some form of corrective action.[17]

---

[14] The policy and procedure attempt to cover all types of administrative complaints, from unauthorized use of force, inappropriate sexual contact with inmates, to rudeness to coworkers; this report addresses only the procedures that apply to complaints that fall into the category of sexual harassment, broadly conceived.

[15] Although not clear from the policy, deposition testimony (Means, Hartz) suggests that these requests are not automatically granted but are evaluated by senior leadership.

[16] The above is a brief summary of what is an extremely complex process; rather than going into more detail at this point, this report will save its analysis and commentary for the final section.

[17] IDOC policies distinguish between summary action, corrective action, and disciplinary action; for purposes of this report, the term "sanctions" will be employed for any and all of these actions, which will be distinguished as necessary for the sense of the report.

**Analysis and Evaluation**

The main strengths of these policies and procedures is their completeness and flexibility; ironically, these are also their main weaknesses. The policies are so detailed, with multiple sections, subsections, and appendices, it is difficult to know where to begin to identify specific information. The virtues of simplicity, as they apply to policy development, have already been discussed.

Similarly, processes are overlapping, with multiple options, decision points, et cetera, each of which can be applicable to a particular situation. Although flexibility is one hallmark of an effective policy, <u>in the present case the flexibility is such that virtually any particular complaint could lead to any number of processes, procedures, conclusions, and actions, thus eliminating any sort of standardization, which is also one of the hallmarks of a fair policy.</u> This situation is well illustrated by Policy 201, Attachment A, a complicated flow chart purporting to show the numerous paths that a complaint could take within IDOC.

<u>In particular, there numerous decision points that allow for supervisory or managerial discretion. Although managerial discretion is not in and of itself a bad thing, in the present case, its consistent misuse is directly responsible for the longtime retention of a serial sexual abuser, despite widespread official departmental knowledge of his proclivities. The following sections detail specific policy and procedure related failures on the part of IDOC that allowed Mr. Cruz to remain in the workplace, undisciplined and unrestrained, for nearly a decade following his first offense, culminating in his battering and sodomizing of the plaintiff.</u>

**Failure to Investigate**

- IDOC's first direct knowledge of Mr. Cruz's behavior came in **2003**, nearly a decade before he raped and battered Cindy Fuller.[18] At that time, CO Sandy Martin, a correctional officer at Orofino correctional institution, complained to her supervisor, <u>Captain Shriver,</u> about Herbt Cruz sexually harassing her; a second CO (<u>Officer Shedd</u>), to whom Cruz had spoken about CO Martin, turned in an incident report detailing some of this harassment; **Captain Shriver took no action, nor did he report the incident to HR as the policy requires**.

- IDOC's knowledge of Mr. Cruz was then reinforced by legal complaints, and testimony in **2006**, when Ms. Martin filed a discrimination lawsuit against the department; although the suit itself was not successful, <u>departmental attorneys and administrators</u> were, through it, re-reminded of the documented problems with Cruz. **No action was taken.**

---

[18] Mr. Cruz's victims and alleged victims extend beyond the employees of IDOC, although all are related to Mr. Cruz's duties in some fashion. For the most part, these women will not be discussed here.

- In late **2009 or 2010**, IDOC learned of Cruz's mistreatment/harassment of Letitia Davila and Amy McCurry, when Cruz applied to transfer back to District 3. Davila and Martin reported Cruz's behavior to <u>Section Supervisor Kraig Galloway</u>, detailing their concerns and desire not to have to work with him.

- Section Supervisor Galloway contacted <u>District Manager Kim Harvey</u>, told him of the women's concerns, and DM Harvey spoke with both women on the telephone. Galloway told Mr. Harvey that he "did not want (Cruz) working in (his) office" (Galloway, p. 83), and Harvey agreed that Cruz would not be placed there. **This conversation was not documented in any way, the women's complaints were not investigated, and Cruz was simply transferred to a different office** (Caldwell), where he met and subsequently victimized the current plaintiff.

- Within the month, Officers Davila and McCurry brought up their concerns and their conversation with Kim Harvey in the Payette team meeting; all <u>probation and parole officers at Payette</u> were thus made aware of Cruz's behavior. **No action was taken.**

- Kim Harvey called <u>Deputy Chief Henry Atencio</u> and told him about the Cruz/Davila/McCurry incidents. **No action was taken and HR was still not notified.**

- Rather than initiating an investigation, Kim Harvey talked to the other Section Supervisors (Alambra, Martin, and Crowell) and asked them to "keep an eye" on Cruz. **None of these senior managers initiated an investigation, and at no time did any manager or supervisor speak to Officer Cruz. No report was made to HR.**

- As part of what might be thought of as a "preliminary inquiry", Kim Harvey spoke to <u>Dawn Anderson</u>, his counterpart in District 5, who told him that a road supervisor had called to complain about Cruz disregarding a female flagger and then asking her out. **Harvey still did not suggest that Cruz be investigated.**

- Henry Atencio, Deputy Chief of Probation and Parole, testified that he "was not overly concerned" about the McCurry/Davila allegations but that he nonetheless told Kevin Klempf, Division Chief, and also "someone" at HR. **No action was taken and Cruz was transferred into District 3, Caldwell office.**

- Mr. Atencio also testified that he directed Mr. Harvey to tell Mr. Cruz that inappropriate behavior would not be tolerated in District 3; he testified that such "coaching" should have been memorialized on a departmental form. **There is no evidence that any of this ever happened.**

- Mr. Cruz was not only not investigated, he was never coached warned or even spoken to about his behavior during all his years at IDOC; indeed, he continued to receive performance evaluations that praised him for his commitment to the vision of the IDOC, the goals of Equal Opportunity, and his ability to work well with others.

## Failure to Follow the Policy

IDOC's Policy 227 (Administrative Investigations) states in relevant part:
*"It is essential that the management authority receiving the complaint initially recognize whether the complaint requires an investigation.*

*"If management authority believes the complaint could require an investigation, notification must immediately be made to OPS.  If it appears no investigation is required, notification must immediately be made to HR."*

In the case of Davila and McCurry, there is no evidence that any of the four managers with direct knowledge (Galloway, Harvey, Atencio, and Klempf) ever contemplated an investigation, despite the seriousness of the allegations (e.g., physical restraint, physical groping); indeed, Deputy Chief Atencio testified that he did not consider the allegations to rise to the level of sexual harassment.

There is also no evidence that any of this information actually made its way to HR or OPS, as required by Policy 227.[19]

## Failure to Take Responsibility

A persistent theme in the testimony and case documents is the failure of IDOC's managers to take responsibility for stopping, investigating, or disciplining harassing behavior.  Rather, the responsibility is consistently displaced onto the victims/targets:

- For example, Kim Harvey testified:  *"So I asked them if they wanted to file a complaint.  Both of them said that they did not."* (Harvey, p. 46)…*"Number two: I asked them…do you want to file a complaint."*  Harvey, p. 49)

- What this fails to recognize is that Davila and McCurry had <u>already</u> made complaints, first to Galloway and then to Harvey.  To ask them at this point whether they wished (again) to make a (formal) complaint, places an unreasonable burden on the process, demanding as it does that victims, widely known to be reluctant to come forward, make at least two and possibly three separate decisions to pursue their concerns.

- What it also fails to recognize is that <u>the responsibility for a safe workplace lies not with the victims but with management</u>; management has the responsibility to

---

[19] Chief Atencio testified that he believes he spoke to someone in HR, most likely Roberta Hartz, but there is no evidence that this is the case and no documentation of such a contact exists.

pursue these issues whether the employee wishes to do so or not, a responsibility that Chief Atencio acknowledged in his deposition.

**Failure to Document Critical Information**

IDOC policies clearly require that complaints be documented; in practice, however, this does not appear to be the case.

- Available evidence suggests that Sandy Martin's complaint was never reported to HR, the required step if no investigation is undertaken.

- Davila and McCurry's complaints were neither investigated, documented, nor reported to HR.

- Roberta Hartz, Senior HR Specialist testified in her deposition: *"Just because someone calls it a complaint, it isn't necessarily a formal complaint"*.

- Ms. Hartz also testified that large parts of IDOC's disciplinary process is not documented; for example, Letters of Reprimand are not tracked centrally but go into the employee's file; verbal and written warnings are apparently not (always) tracked at all.

- Ms. Hartz testified that managers would call her for information and assistance with issues of sexual harassment and that, when they did, she would take notes of these interactions and document them; however, no such notes or documentation have ever been produced.

- Ms. Hartz testified that supervisors did not always interpret things the same way, sometimes interpreting levels of seriousness and discipline differently, thus introducing inconsistency; for example, they didn't necessarily have to use the form, they could send an email, or possibly address the issue verbally and this would be OK. She eventually testified that all corrective and disciplinary actions were supposed to be documented, but that it wasn't always necessarily that way.

The problem with such idiosyncrasy and lack of centralization, of course, is that there is no standard way of addressing sexual harassment and no way of tracking a potential offender's history because of the latitude given to supervisors in terms of this issue. This allows for serious offenders to "slip through the cracks", which is apparently what happened in the present situation.

**Summary and Opinions**

IDOC has clearly devoted considerable time and resources to developing its policies, procedures, and training materials. It is also clear from the materials that (at least) the developers were well-intentioned, with a focus on fair and equitable treatment. At the same time, it is difficult to avoid the old cliché "They just don't get it". Once

management learns of a problem, it is not up to the victim to decide if it should be addressed; nor is it her responsibility to come up with the solution. If an employee is credibly known to have harassed two separate women, the solution is not to move him to another location (where he can harass others). If he is suspected of harassing behavior, the solution is to investigate the situation, not "keep an eye on him" to see if he does it again. If an employee makes a complaint of harassment, it is not appropriate to dismiss it because she didn't report it immediately. If serious harassment has forced an employee on to unpaid leave for medical/psychological reasons, the solution is to find a way to accommodate her needs, not to essentially economically force her out and then refuse to hire her back because her victimizer was not criminally charged and her decision to resign was "emotional".

This combination of unprofessional, dysfunctional, and victim-penalizing procedures sends exactly the wrong message to employees, telling both potential offenders and victims alike that the organization has a climate tolerant of sexual harassment: that is, harassment is not taken seriously, it is ineffective and risky to complain, and there is little likelihood of meaningful sanctions. If it is IDOC's goal to convince its employees that it is useless to complain of harassment, in this case it has been successful.

**Organizational Opinions**

1. The IDOC SH prevention and remediation policies are overly complex, overly stringent, and scattered throughout a number of locations.

2. IDOC supervisors and managers, in the present case, did not follow their stated policies, thus allowing a serial predator to remain in their organization for nearly a decade, with tragic results.

3. This mishandling of various sexual harassment incidents and complaints is likely related to the lack of specific training focused on managers' responsibilities, as well as the policy flexibility that requires/allows untrained supervisors and managers to make critical decisions at their own discretion.

4. It is the consultant's opinion that from an organizational perspective, the Cruz matter was mishandled from the beginning and that in this mishandling IDOC managed to commit virtually every organizational error possible in dealing with a harasser, complainants, and witnesses.

DocuSigned by:

*Louise Fitzgerald*

237A9E1F869E49E

38